Bradford A. Clements
CA Bar No. 310398 (inactive)
TX Bar No. 24059588 (active membership status, non-practicing MCLE)
16 Old Track Road, Unit PH6
Greenwich, CT 06830
Bac2007@caa.columbia.edu
Telephone: 830-992-9202
Pro Se Attorney Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

No. 5:22-cv-07512-SVK

BRADFORD A. CLEMENTS

     Plaintiff,

v.

T-MOBILE US, INC. and T-MOBILE USA, Inc.

     Defendants.

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff BRADFORD A. CLEMENTS ("Plaintiff") hereby brings this First Amended Complaint against T-Mobile US, Inc. and T-Mobile USA, Inc. ("Defendants"). Plaintiff alleges as follows:

**INTRODUCTION**

*"You can trust us to do the right thing with your data."*

1.    In Plaintiff's approximately three years as a T-Mobile customer (before recently closing his account and switching carriers), he has suffered injuries from the company's **eight** different data breaches. Plaintiff seeks relief from T-Mobile's arrogant and incorrect position that: (a) none of its customers are worthy victims of any of its eight repeated data breaches unless T-Mobile itself identifies you as a victim; and (b) T-Mobile is free to disregard and repudiate an expressly mutual class-action waiver when it suits the company's interest, but customers are still barred from pursuing class actions or mass arbitrations.

2.      With over 100 million customers, T-Mobile is one of the largest consumer brands in the United States. It collects vast troves of personal information from its customers and prospective customers and profits from that data through its own marketing efforts and by selling sensitive consumer information to third parties. After each of the eight data breaches, T-Mobile claimed to understand that it had an enormous responsibility to protect its data and assured consumers through its Privacy Policy that T-Mobile uses "administrative, technical, contractual, and physical safeguards designed to protect your data while it is under our control." Its Privacy Center likewise assured consumers that "[w]ith T-Mobile, you don't have to worry," "[w]e've got your back," and "you can trust us to do the right thing with your data." But, as T-Mobile admitted after the huge August 2021 data breach, it completely failed to meet these obligations and protect sensitive consumer data. Instead, T-Mobile suffered one of the largest and most consequential data breaches in U.S. history, compromising the sensitive personal information of, according to the August 2021 hackers themselves, over 100 million consumers.  And was the August 2021 data breach finally T-Mobile's last? No, T-Mobile inexplicably has already suffered three subsequent data breaches, including one on January 5, 2023 that victimized at least 37 million customers, including Plaintiff.  There is no sign the company will ever take data protection seriously, and Plaintiff has had enough, terminating his business relationship with the company, purchasing credit monitoring and identity protection services, paying extra fees to switch his line to a new carrier, and bringing this suit.  T-Mobile must be held accountable for the harm it has caused Plaintiff with its consistent carelessness and eight repeated data breaches.

### PARTIES

3.      Plaintiff is an individual who resided in Santa Clara County, California at all relevant times in this lawsuit (but now lives in Connecticut).   Upon information and belief, Petitioner had his personally-identifiable information ("PII")[1] exfiltrated and compromised in one or several of Defendant's eight data breaches during the time period in which Plaintiff was a T-Mobile customer.  Because only Defendants

---

[1] PII is information that is used to confirm an individual's identity and can include an individual's name, Social Security number, driver's license number, phone number, financial information, and other identifying information unique to an individual. For Defendant, this information also includes unique technical identifiers tethered to customers' mobile phones.

and the hackers have knowledge of what information was compromised, Plaintiff reserves his right to supplement his allegations with additional facts and injuries as they are discovered.  T-Mobile US, Inc. and its wholly-owned subsidiary T-Mobile USA, Inc. are a telecommunications company that provides wireless voice, messaging, and data services along with mobile phones and accessories. Defendants are headquartered in Bellevue, Washington and Overland Park, Kansas in the Kansas City Metropolitan area, and are incorporated under the laws of the State of Delaware.

## JURISDICTION

4.      Plaintiff is a Connecticut citizen.  Defendants are citizens of Washington, Kansas, and Delaware. The amount in controversy exceeds the sum value of $75,000, exclusive of interest and costs.  Therefore, this Court has original diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is perfect diversity of citizenship between the parties.  Additionally, pursuant to 28 U.S.C. § 1331, Petitioner alleges a cause of action under the federal Stored Communications Act (18 U.S.C. § 2701).

5.      This Court has personal jurisdiction over Defendants because they are authorized to and regularly conduct business in the State of California.  Defendants sold, marketed, and advertised their products and services to Plaintiff when he was a resident of California (and Defendants continue to sell, market, and advertise their products and services in California). Therefore, Defendants have sufficient minimum contacts to render the exercise of jurisdiction by this Court proper and necessary.  Lastly, Defendants solely drafted the mandatory forum-selection clause in all potentially applicable versions of the Terms and Conditions.  While Plaintiff contends no contract was formed, the application of the mandatory forum-selection clause, if a contract was formed, requires disputes between the parties to be adjudicated in this District (San Jose serves Santa Clara County, California).

## DIVISIONAL ASSIGNMENT AND VENUE

6.      Pursuant to Local Rule 3-2(c), this case should be assigned to the San Jose Division because a substantial part of the events or omissions giving rise to the claims herein occurred in Santa Clara County, California.  Specifically, Plaintiff entered into his wireless service contract (not the Terms and Conditions)

with T-Mobile out of a T-Mobile store in Santa Clara County, California.  Five of T-Mobile's eight data breaches during Plaintiff's tenure as a T-Mobile customer occurred while Plaintiff resided in Santa Clara County, California, including the enormous August 2021 data breach.   While the T&C Contract was never formed, it does contain a mandatory forum-selection clause requiring "arbitration or court proceedings" to be held in this Division, as San Jose sits in Santa Clara County, California.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3).  Defendants transact business and may be found in this District.

## STATEMENT OF FACTS REGARDING PLAINTFF'S PARTICULAR EXPERIENCE WITH DEFENDANT'S EIGHT REPEATED DATA BREACHES

**Background**

7.      Plaintiff places significant value in the security of his PII. Plaintiff entrusted his sensitive PII to Defendant with the understanding that Defendant would keep his information secure and employ reasonable and adequate security measures to ensure that it  would not be compromised. If Plaintiff had known of Defendant's lax security practices with respect to Plaintiff's PII, he would not have done business with Defendant, would not have applied for Defendant's services or purchased its products, would not have opened, used, or continued to use Defendant's telecommunications-related services at the applicable rates and on the applicable terms, or would have paid less because of the diminished value of Defendant's services.

**Information from McAfee Implicating Defendant; Costs of McAfee's Services**

8.      After learning about Defendant's eight repeated data breaches, Plaintiff purchased credit monitoring and identity theft protection services from McAfee at a cost of approximately $88.00 in the first year and renewing at approximately $195.00 annually thereafter.  McAfee then notified Plaintiff that his PII was located on the dark web due to the leak of PII from millions of "U.S. cell phone customers." According to McAfee, "The stolen data contains first and last names, addresses, cell phone numbers, email addresses, phone carriers information, gender, home value, household income, and additional personal information. This leak is being privately shared on the internet."  On information and belief, Defendant is the "U.S. cell phone" company whose data was breached.  As a result of the breach, Plaintiff will need to

continue paying for the credit monitoring and identity theft protection services indefinitely in order to mitigate against harm.

**Additional Charges from New Cellphone Carrier**

9.     Because Plaintiff's PII was already stolen as a result of Defendant's data breaches and because Defendants continually allow more data breaches that place Plaintiff at risk, Plaintiff had to switch to a new wireless provider and pay higher rates as well as origination fees such as "line transfer" fees and other fees that made Plaintiff's bill for the first month $156 rather than $85.00 with T-Mobile.

**Summary of Plaintiff's Other Damages**

10.     As a result of one or multiple of Defendant's numerous data breaches, Plaintiff has suffered identity theft and fraud in the form of unauthorized access within his Bay Area FasTrak account, adding an unauthorized, unknown vehicle to his FasTrak account, and multiple unauthorized charges on his FasTrak account (totaling over $525) and on several Chase credit cards.  Consistent with the McAfee report, the theft of Plaintiff's Bay Area address (and other PII) from one or several of Defendant's eight data breaches allowed a bad actor to target a fraud scheme with Plaintiff's Bay Area FasTrak account. Further specifics are detailed in the following sections.  As a result of this identity theft and fraud, Plaintiff lost a significant sum of money without recovery and spent time filing a police report in Mountain View, California report.  In addition, as a result of the breaches, Plaintiff spent time and effort researching the breaches, reviewing his credit reports, changing his passwords, calling/emailing/writing FasTrak Chase and monitoring his credit and bank accounts for fraudulent activity as well as ongoing attempts to resolve the FasTrak and Chase frauds.  Also as a consequence of the breaches, Plaintiff is frequently forced to unlock and relock his credit to make purchases.

11.     During Plaintiff's roughly three years with Defendant, Plaintiff has experienced a dramatic increase in the volume of spam phone calls and text messages and solicitations he receives, as well as spoof emails – combined, these unwanted communications easily total in the high hundreds and possibly more than 1,000. These unwanted communications caused Plaintiff to change his email address, but he is unable to change his phone number for professional reasons.  The unwanted communications impose

significant and ongoing burden on Plaintiff who relies on his device and email to perform his job duties. Defendant's eight repeated data breaches, the theft of Plaintiff's PII therefrom, the repeated text message and call scamming and fishing Plaintiff experienced caused Plaintiff to leave Defendant for another cellular service provider – with a higher monthly bill and lost time in shopping around for a new carrier.  To date, Plaintiff has easily spent well over 50 hours resolving the aforementioned issues.

12.     Given the highly-sensitive nature of the information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff has already suffered injury and remains at a substantial and increased risk of future harm.

**Bay Area FasTrak ID Theft and $525.45 in Unauthorized Charges**

13.     Plaintiff lived in Mountain View, California from October 2015 through October 2021.  Plaintiff has always only owned *one car at a time*. In March 2018, Plaintiff sold his previous car and purchased a Tesla Model S with license plate ▮▮▮▮.  These are the only two vehicles Plaintiff has owned or driven in the past 7 years.  All FasTrak charges from July 2019 and after relating to license plate ▮▮▮▮ were proper.  Every month or two, Plaintiff would cross the Golden Gate Bridge or go across a bridge to the East Bay to go for a hike, so Plaintiff expected to see some charges on his FasTrak account.  Plaintiff moved from California to Texas in October 2021 and has not returned to California since.  When Plaintiff continued to see FasTrak charges after Plaintiff moved out of California, this raised his suspicion and Plaintiff tried to investigate.  Originally, Plaintiff was unable to sign in to FasTrak online, but eventually Plaintiff regained access.

14.     Beginning in September 2020, Plaintiff now sees that he started being charged for tolls from a vehicle with California license plate ▮▮▮▮.  FasTrak's records indicate that the criminal's vehicle is a Toyota Prius.  This is not Plaintiff's vehicle, and Plaintiff did not consent to being charged for that vehicle's tolls. Plaintiff has no idea who owns or drives that vehicle.  All that is required to make changes to one's FasTrak account (either over the phone, by mail, or online) are email and identifying information like date of birth, phone number, or address.  The credit card attached to the account was on autopay, and the criminal did not need to know that number.  Ultimately, the criminal used his PII from Defendant's

data breaches to illegally—and without his knowledge or consent—add his/her Toyota Prius with license plate ▮▮▮▮ to Plaintiff's FasTrak account.  To reiterate, someone has fraudulently used Plaintiff's FasTrak account with its attached Chase credit card to pay for tolls that Plaintiff absolutely did not and does not consent to.  From September 2020 through the most recent February 3, 2022 statement, Plaintiff has been fraudulently charged and paid $525.45 in FasTrak tolls.  There are also additional charges for February 2022 that Plaintiff has refused to pay despite FasTrak's threatening letters and emails and fees and penalties.  Plaintiff believes this has likely damaged his credit rating.  Plaintiff was able to get into his account and remove ▮▮▮▮ in late February 2022.  Plaintiff filed a police report with the Austin Police Department about the ID theft and fraudulent FasTrak charges.  Plaintiff also called the Austin police and asked them to please investigate who the owner of ▮▮▮▮ is, but they have never followed up with Plaintiff.  In February 2022, Plaintiff submitted detailed information to FasTrak seeking a refund for the fraudulent charges, but FasTrak has refused to return any money to Plaintiff because it claims Plaintiff did not catch the ID theft and unauthorized charges soon enough.  Plaintiff also asked FasTrak to provide him the individual's name and contact information corresponding to CA license plate ▮▮▮▮.  Plaintiff wanted to provide this information to the police and also potentially use it to sue the criminal, but FasTrak never provided him it.

**Credit Card Fraud, Numerous Unauthorized Charges, and $25.00 Late Fee**

15.	Similar to the Bay Area FasTrak ID theft and unauthorized charges above, criminal(s) obtained from one or several of Defendant's eight data breaches Plaintiff's stolen PII, potentially including Plaintiff's Chase credit card numbers from autopay or using Plaintiff's other stolen PII to obtain these credit-card account numbers, which were then subjected to the fraudulent and unauthorized charges described below.

***Five Fraudulent Amazon Prime Unauthorized Charges Forced Plaintiff to Change Account Number on One Card and Pay a $25 Late Fee***

16.	On November 15, 2019, a criminal used a Chase credit card account number (the same one Plaintiff used for T-Mobile autopay) to make an unauthorized charge of $13.85 for Amazon Prime. Again on November 28, 2019, a criminal used the Chase credit card account number to make a second

unauthorized charge of $13.85 for Amazon Prime. For a third time, on December 28, 2019, a criminal used the Chase credit card account number to make another unauthorized charge of $13.85 for Amazon Prime. For a fourth time, on January 3, 2020, a criminal used the Chase credit card to make another unauthorized charge of $13.85 for Amazon Prime. Chase required Plaintiff to call them on both January 3, 2020 and January 7, 2020 in order for Plaintiff to continue using the credit card. Plaintiff's phone records unfortunately do not go back this far, but Plaintiff did call Chase both times in order to continue using the card. For a fifth time, on January 9, 2020, a criminal used the Chase credit card account number to make another unauthorized charge of $13.85 for Amazon Prime. After so many fraudulent, unauthorized charges on this Chase credit card account number, Plaintiff had to go through the huge hassle and ordeal of canceling the credit card number and receiving a new card and account number. Hence, Plaintiff had to wait for the new card to arrive, during which time Plaintiff was unable to make any purchases. Plaintiff also had to destroy the old card, notify (both online and on the telephone, often with long hold times) approximately 40 merchants that automatically bill the account of the new account number, check past statements for additional fraudulent and unauthorized charges, figure out rewards point rules and confirm points carryover, etc. Plaintiff was not able to access his records for the old card number, but Plaintiff does recall that there was either a $40 finance charge or a $25 late fee that Plaintiff incurred as a result of canceling one card, dealing with the whole mess, and waiting for the next card. Plaintiff is just assuming $25.

***January 2022 Fraudulent $121.08 Silver Singles Unauthorized Charge on Different Card***

17.     Another of Plaintiff's Chase credit card account numbers (different than the one described above and used again with T-Mobile autopay) was the subject of a fraudulent and unauthorized $121.08 Silver Singles charge on January 18, 2022. Silver Singles is a dating website for elderly people, yet Plaintiff was 39 years old in January 2022. Plaintiff has never used Silver Singles services, and it is preposterous to think that Plaintiff has any connection at all to that site. Plaintiff had to make several phone calls (see, e.g., phone records April 2022) to Silver Singles at 1-800-942-6026 in order to finally get them to reverse the charge a month later.

*March 2022 Fraudulent $413.40 Coach Outlet Unauthorized Charge on Aforementioned Account Forces Me to Change Account Number on Different Card*

18.     Following the fraudulent and unauthorized Silver Singles charge above, on March 17, 2022, a criminal used that same Chase credit card account number to make an unauthorized charge of $413.40 at Coach Outlet in Florida.  Please note that Plaintiff lived in Texas at this time and has not been to Florida in years. As this now totaled two fraudulent and significant unauthorized charges on the different Chase account number—and followed the five earlier fraudulent and unauthorized Amazon Prime charges—Chase required Plaintiff to call them and immediately close the account and have a new credit card with a new account number sent.  A letter from Chase confirms that they had to change his credit card number and send Plaintiff a new card.  Phone records confirm that Plaintiff had to make three calls to Chase at 1-800-524-3800 and endure long wait times and dropped calls in order to cancel the card and request a new one.  As with the first instance described above, Plaintiff had to wait for the new card to arrive, during which time Plaintiff was unable to make any purchases.  Plaintiff also had to destroy the old card, notify (both online and on the telephone, often with long hold times) approximately 40 merchants that automatically bill the account of the new account number, check past statements for additional fraudulent and unauthorized charges, figure out rewards point rules and confirm points carryover, etc.

**GENERAL STATEMENT OF FACTS REGARDING DEFENDANT'S EIGHT REPEATED DATA BREACHES**

**A.  Defendant Collects, Stores, And Profits From Consumer Information, And Promises To Keep It Secure.**

19.     Defendant is a U.S. wireless carrier formed in 1999 following Deutsche Telekom's purchase of VoiceStream Wireless. After the purchase, Deutsche Telekom renamed the U.S. wireless business "T-Mobile." Following a series of mergers and acquisitions – including mergers with MetroPCS in 2013 and Sprint Corporation in 2020 – Defendant grew to the second largest wireless carrier in the United States, with over 100 million current subscribers.[2] Defendant is a publicly traded company organized and operated for the profit and financial benefit of its shareholders. In 2021, Defendant had annual gross revenues of

---

[2] Shortly before the August 2021 data breach, Defendant reported in its 10-Q for the second quarter of 2022 that it had approximately 105 million total customers

over $80 billion, with net income over $3 billion.

20.     Defendant has often attempted to distinguish itself from its competitors by promoting its purportedly unique customer experience. For example, since 2013 Defendant has marketed itself as the "un-carrier,"[3] providing wireless services with no service contracts. As current CEO Michael Sievert has described it, Defendant's strategy as an un-carrier means "the ability to enjoy the services we sell, like an unlimited network offering that doesn't require a contract."[4]

21.     As the "uncarrier," Defendant offers different types of plans, including prepaid plans, wherein customers prepay for services they then receive, and postpaid plans, wherein customers can be billed for monthly services already received.[5]

22.     To run its business, Defendant collects, maintains, and profits from the PII of millions of U.S. consumers. PII is information that is used to confirm an individual's identity and can include an individual's name, Social Security number, driver's license number, phone number, financial information, and other identifying information unique to an individual. For Defendant, this information also includes unique technical identifiers tethered to customers' mobile phones. Defendant collects this PII from all prospective and current customers and maintains and profits from the PII regardless of whether a potential customer eventually selects Defendant as a wireless carrier. Defendant also maintains the PII of former customers for an indefinite period of time.

23.     Defendant's Privacy Policy is available on its website and provides customers with detailed promises regarding the treatment of their PII, including how Defendant uses customers' data for its own benefit and profit.[6]  For example, Defendant confirms that it uses customers' personal data to "[a]dvertise

---

[3] *The Un-carrier Means Business* (May 3, 2021), available at https://www.t- mobile.com/news/business/the-un-carrier-means-business.

[4] *What is an Uncarrier? We Ask Defendant Chief Marketing Officer Mike Sievert* (Jan. 23, 2013), available at https://www.digitaltrends.com/mobile/t-mobile-disruptive-mike-sievert/.

[5] *What's the Difference Between Prepaid & Postpaid Plans?*, Let's Talk (Jan. 31, 2020), available at https://www.letstalk.com/cellphones/difference-between-prepaid-postpaid-plans/.

[6] The Privacy Policy in place at the time of the Data Breach is dated May 5, 2021, and the quotes herein are to that policy. Defendant Privacy Policy (May 4, 2021), available at https://web.archive.org/web/20210816234224/https://www.t-mobile.com/privacy-center/out-  practices/privacy-policy. Defendant has subsequently issued an update to its Privacy Policy as of February 23, 2022, which remains largely the same.

and market products and services from Defendant and other companies to you, including through targeted advertising and communications about promotions and events, contents, and sweepstakes"; and to "[c]onduct research and create reports from analysis of things like usage patterns and trends and deidentify or aggregate personal data to create business and market analysis and reports."

24.     The Privacy Policy states: "[S]tarting on April 26, 2021, Defendant will begin using some data we have about you, including information we learn from your web and device usage data (like the apps installed on your device) and interactions with our products and services, for our own and 3rd party advertising, unless you tell us not to."

25.     According to the Privacy Policy's California privacy rights section, included for purposes of complying with the California Consumer Protection Act ("CCPA"), in the past 12 months Defendant has sold to third parties "device identifiers and internet and electronic network activity to facilitate online advertising. This means that a unique, resettable number that  identifies your device was linked to online activity and shared with others who use that data for advertising and analytics purposes (like advertising networks, data analytics providers, and social media platforms)."

26.     Based on the customer PII Defendant collects and sells, Defendant states that its customers "may see Defendant's and other advertisements on your devices-whether you are connected to our network or not. These ads may be targeted to your device based on information that we, the advertiser, and other third parties have about your behavior or interests."

27.     Defendant also "works with third parties, including advertising networks, which collect information about you through devices, websites, and apps, serve ads for us and others, and measure their effectiveness. … For example, third parties like Google Ad Manager and Nielsen may use technology to collect data to deliver, personalize, and measure ads for some of our Products and Services. This technology allows tracking of device activity over time across online properties."

28.     In addition, Defendant partners "with analytic service providers like Google Analytics to help track your use of our products and services." "If your mobile device is turned on, our network is collecting data about whose it is. We may use, provide access to, or disclose this network location data without your

permission to provide and support our services."

29. After listing the ways Defendant benefits and profits from tracking and targeting its customers and non-customers through collecting and maintaining their valuable PII, Defendant's Privacy Policy pledges to them that their PII is secure, stating that: (i) personal data will be disclosed only "with your consent, which we may get in writing, online, or orally," and (ii) Defendant uses "administrative, technical, contractual, and physical safeguards designed to protect your data while it is under our control." As discussed herein, Defendant failed to comply with these promises to protect Plaintiff's PII.

30. Defendant's "Privacy Center" on its website also assures customers that "[w]ith [Defendant], you don't have to worry," "[w]e've got your back," and "you can trust us to do the right thing with your data."[7] These assurances have proved hollow for Plaintiff and the millions of consumers affected by Defendant's breach of trust and failure to protect their PII.

**B. Defendant Has a Long History of Data Breaches and Six During Plaintiff's Three-Year Tenure.**

31. The harm suffered by Plaintiff from Defendant's eight repeated data breaches during his tenure with the company is directly attributable to Defendant's history of security lapses and data mismanagement. Indeed, Defendant is no stranger to cybersecurity incidents resulting from its flawed security. Rather, data breaches have been a nearly annual event for the company for many years.

32. In 2017, Karan Saini, a security researcher, found a bug on a Defendant's website that allowed hackers to access PII like email addresses, account numbers, and IMSI numbers, just by knowing or guessing a customer's phone number.[8] According to Saini, "Defendant has 76 million customers, and an attacker could have ran a script to scrape the data (email, name, billing account number, IMSI number, other numbers under the same account which are usually family members) from all 76 million of these

---

[7] *The Privacy You Deserve, The Choices You Want*, Defendant, available at https://www.t- mobile.com/privacy-center.
[8] Lorenzo Franceschi-Bicchierai, *Defendant Website Allowed Hackers to Access Your Account Data With Just Your Phone Number*, Motherboard (Oct. 10, 2017), available at https://www.vice.com/en/article/wjx3e4/t-mobile-website-allowed-hackers-to-access-your- account-data-with-just-your-phone-number.

customers to create a searchable database with accurate and up-to-date information of all users."[9]  Saini explained "[t]hat would effectively be classified as a very critical data breach, making every Defendant cell phone owner a victim."[10]  Defendant had no mechanism in place to prevent this type of critical data breach, according to Saini.[11]  According to a hacker, the bug had been exploited by multiple hackers over a multi-week period before it was discovered by Saini.[12]  In fact, the hackers who found the bug before Saini went so far as to upload a tutorial on how to exploit it on YouTube.[13]

33.   In August 2018, hackers gained access to Defendant servers and stole the PII of roughly two million Defendant customers.[14]  The stolen PII included names, email addresses, account numbers, other billing information, and encrypted passwords.[15]  Defendant misleadingly downplayed the hack, claiming that no passwords were "compromised."[16]  In truth, the hackers stole millions of encrypted passwords that were likely decrypted by the hackers due to the weak encoding algorithm employed by Defendant, leading one security expert to advise affected customers to assume his passwords were cracked and change them as a result.[17]

34.   In November 2019, hackers accessed the PII of roughly 1 million Defendant prepaid customers.[18]  The PII in that breach included names, phone numbers, addresses, account information, and rate, plan and calling features (i.e., paying for international calls).[19]

35.   In March 2020, Defendant disclosed it was subject to a data breach that exposed customer and employee PII, including names, addresses, social security numbers, financial account information,

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] Lorenzo Franceschi-Bicchierai, *Hackers Stole Personal Data of 2 Million Defendant Customers*, Motherboard (Aug, 23, 2018), available at https://www.vice.com/en/article/a3qpk5/t- mobile-hack-data-breach-api-customer-data.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] Devin Coldeway, *More Than 1 Million Defendant Customers Exposed by Breach*, TechCrunch (Nov. 22, 2019), available at https://techcrunch.com/2019/11/22/more-than-1- million-t-mobile-customers-exposed-by-breach/.

[19] *Id.*

government identification numbers, phone numbers and billing account information.[20]   In December

2020, Defendant suffered yet another data breach in which hackers accessed customer proprietary

network information (CPNI) and undisclosed call-related information for hundreds of thousands of

customers.[21]  In February 2021, Defendant disclosed another data breach after an unknown number of

customers were affected by SIM swap attacks.[22]

36.     Therefore, it is no surprise that in August 2021, when reporting on the major August 2021 data

breach, *The Washington Post* reported that "[u]nfortunately, dealing with data breaches is nothing new for

the company – or its customers. For those keeping count, this is the *fifth such incident* the wireless carrier

has suffered in *the past three years*, but according to Allie Mellen, a security and risk analyst at Forrester

Research, this is 'the worst breach they've had so far.'"[23]

37.     Given the numerous data breaches pre-dating the August 2021 breach, Defendant was clearly

aware of its data security failures, and the fact that subsequent breaches have occurred reinforces that

Plaintiff's PII, which remains in Defendant's possession, is not safe.

**C.    Despite Its Promises of Learning from Earlier Breaches, Defendant Still Failed To Protect Plaintiff's Sensitive PII in Major August 2021 Breach, as Well as Several More.**

38.     At the same time Defendant collected, stored, and profited from Plaintiff's PII – and was actively

communicating to consumers that "you can trust us to do the right thing with your data" – it suffered one

of the largest data breaches in history.

39.     Sometime in 2021, John Erin Binns, an American in his early twenties living in Turkey, began

using a simple software tool freely available to the public to scan Defendant's known internet addresses

---

[20] *Defendant Breach Leads to The Exposure of Employee Email Accounts and User Data*, Identity Theft Resource Center (Mar. 5, 2020), available at https://www.idtheftcenter.org/t- mobile-breach-leads-to-the-exposure-of-employee-email-accounts-and-user-data/.

[21] Alicia Hope, *Second Data Breach in 2020 for Defendant Exposed Customer and Call- Related Information of 200,000 Subscribers*, CPO Magazine (Jan. 11, 2021), available at https://www.cpomagazine.com/cyber-security/second-data-breach-in-2020-for-t-mobile-exposed-customer-and-call-related-information-of-200000-subscribers/.

[22] https://www.csoonline.com/article/3686053/t-mobile-suffers-8th-data-breach-in-less-than-5-years html

[23] Chris Velazco, *Here's What to Do If You Think You're Affected by Defendant's Big Data Breach*, Wash. Post (Aug. 19, 2021), available at https://www.washingtonpost.com/technology/2021/08/19/t-mobile-data-breach-what-to-do/.

for weak points.[24]  This software tool revealed a router on Defendant's network that was unprotected and exposed to the internet.[25]

40.     On information and belief, the router discovered by Binns was a Gateway GPRS Support Node, or GGSN.[26]  GPRS (or General Packet Radio Service) is a legacy technology that allows mobile devices using 2G or 3G mobile networks to reach the internet.[27]  A GGSN acts as an interface between the GPRS backbone and the internet, allowing information coming from a carrier's internal network to flow onto the internet.[28]  Binns discovered a misconfigured Defendant GGSN, apparently used for testing, that was exposed to the internet.[29]

41.     Binns utilized the misconfigured GGSN to gain access to Defendant's internal network.[30]  Once inside Defendant's network, Binns "pivoted through several different IP addresses and eventually got access to his production servers."[31]  There, Binns discovered a cache of stored credentials that allowed him to access more than 100 servers on Defendant's internal network.[32]

42.     Binns was able to use the stolen credentials to break into Defendant's internal network because Defendant had not employed a protection called "rate limiting," which is an industry standard protection. Rate limiting restricts the number of requests that a user can make over a given period, thus limiting the effectiveness of automated credential-stuffing or brute- force attacks. But, according to Binns, none of

---

[24] Drew FitzGerald & Robert McMillan, *Defendant Hacker Who Stole Data on 50 Million Customers: 'Their Security Is Awful'*, Wall St. J. (Aug. 27, 2021), available at https://www.wsj.com/articles/t-mobile-hacker-who-stole-data-on-50-million-customers-his-security-is-awful-11629985105.

[25] *Id.*

[26] Jeremy Kirk, *Defendant USA Investigates Possible Data Breach*, BankInfoSecurity (Aug. 16, 2021), available at https://www.bankinfosecurity.com/t-mobile-usa-investigates- possible-data-breach-a-17293.

[27] *GPRS & Edge*, 3GPP, available at https://www.3gpp.org/technologies/keywords- acronyms/102-gprs-edge.

[28] Christos Xenakis, *Security Measures and Weaknesses of the GPRS Security Architecture*, 6 Int'l J. of Network Security 158, 159 (2008).

[29] Jeremy Kirk, *Defendant USA Investigates Possible Data Breach*, BankInfoSecurity (Aug. 16, 2021); @Jeremy_Kirk, Twitter (Aug. 16, 2021, 1:46 AM), available at https://twitter.com/Jeremy_Kirk/status/1427144723731402756.

[30] Jeremy Kirk, *Defendant Probes Attack, Confirms Systems Were Breached*, Data Breach Today (Aug. 17, 2021), available at https://www.databreachtoday.com/t-mobile-says-systems- illegally-accessed-as-probe-continues-a-17303.

[31] Jeremy Kirk, *Defendant USA Investigates Possible Data Breach*, BankInfoSecurity (Aug. 16, 2021).

[32] Drew FitzGerald & Robert McMillan, *Defendant Hacker Who Stole Data on 50 Million Customers: 'Their Security Is Awful'*, Wall St. J. (Aug. 27, 2021).

Defendant's hacked servers had rate limiting enabled.[33]

43. Due to Defendant's insufficient security, Binns explained to *The Wall Street Journal* that it took him only a week to break into the servers containing the PII of millions of Defendant's current, former, and prospective customers.[34] Binns claims that he exfiltrated this Defendant customer data on or around August 4, 2021,[35] and that he had access to Defendant's systems for two to three weeks, until August 14, 2021.[36] Defendant has publicly claimed that the hacker gained access to some of its systems "on or before" March 18, 2021, and began taking the data of current, former, and prospective customers on August 3, 2021.[37] It is not clear if there was more than one attacker.

44. Given the magnitude of the information that Binns was able to access, Binns admitted to *The Wall Street Journal* that he was "panicking because Plaintiff had access to something big."[38] Binns also gave *The Wall Street Journal* his frank assessment of Defendant's cybersecurity protections: "[t]heir security is awful."[39]

**D. Defendant Discovered the August 2021 Breach After Its Customers' PII Appeared For Sale On The Dark Web.**

45. PII stolen in data breaches is often sold in dark-web marketplaces, sometimes referred to as carding forums. In these forums, cybercriminals don't just sell and buy PII, but also share information and tips on how to hack websites and use stolen data. Some of these marketplaces are highly sophisticated and even offer guarantees on the usability of the data, including moneyback guarantees. The stolen data sold or shared is then used by criminals to engage in various fraudulent schemes targeted at data breach victims.

---

[33] Jeremy Kirk, *Defendant USA Investigates Possible Data Breach*, BankInfoSecurity (Aug. 16, 2021); @Jeremy_Kirk, Twitter (Aug. 16, 2021, 1:46 AM), available at https://twitter.com/Jeremy_Kirk/status/1427144726025629704.

[34] Drew FitzGerald & Robert McMillan, *Defendant Hacker Who Stole Data on 50 Million Customers: 'Their Security Is Awful'*, Wall St. J. (Aug. 27, 2021).

[35] *Id.*

[36] Jeremy Kirk, *Defendant USA Investigates Possible Data Breach*, BankInfoSecurity (Aug. 16, 2021).

[37] Defendant US, Inc., Quarterly Report (Form 10-Q) (Nov. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1283699/000128369921000169/tmus-20210930.htm.

[38] Drew FitzGerald & Robert McMillan, *Defendant Hacker Who Stole Data on 50 Million Customers: 'Their Security Is Awful'*, Wall St. J. (Aug. 27, 2021).

[39] *Id.*

46.     On or around August 11, 2021, on one such dark-web forum known as "RaidForums," a user codenamed "SubVirt" unveiled for the first time a "freshly breached" database of "124M U.S.A. SSN, DOB, DL."[40] SubVirt offered to sell a subset of the database to RaidForum's clientele of hackers, scammers, and other cybercriminals in exchange for eight Bitcoin, valued at around $270,000 at the time.[41]  The offer included a sample of personal data from the breach and noted that the dataset included "30 million unique SSNs."[42]  SubVirt stated that the "data has never been sold to anyone else and is not public."[43]

**RaidForums Post Offering to Sell Defendant Data**



---

[40] Brian Krebs, *Defendant Investigating Claims of Massive Data Breach*, KrebsOnSecurity (Aug. 16, 2021), available at https://krebsonsecurity.com/2021/08/t-mobile-investigating-claims- of-massive-data-breach/; *United States v. Coelho*, No. 1:21-cr-114, Doc. 12, Indictment ¶ 33 (E.D. Va. Mar. 15, 2022), available at https://www.justice.gov/opa/press- release/file1493586/download.

[41] Joseph Cox, *Defendant Investigating Claims of Massive Customer Data Breach*, Motherboard (Aug. 15, 2021), available at https://www.vice.com/en/article/akg8wg/tmobile- investigating-customer-data-breach-100-million

[42] Brian Krebs, *Defendant Investigating Claims of Massive Data Breach*, KrebsOnSecurity (Aug. 16, 2021).

[43] *Id.*

47.     Several days later, on August 15, 2021, the technology news website Motherboard revealed that the data for sale in the RaidForums post was the PII of millions of T-Mobile customers, taken in a breach of Defendant's servers.[44]   The seller stated that he had "***full customer info***" on over 100 million "T-Mobile USA" customers.[45]   The seller had shared samples of the data with Motherboard, and the website confirmed that the data contained accurate information on Defendant customers.[46]

48.     Defendant was aware that its customers' and prospective customers' data was for sale on the dark web because Defendant attempted to purchase the data. On April 12, 2022, an unsealed FBI indictment revealed that a "major telecommunications company and wireless network operator," which upon information and belief is Defendant, hired a third-party to attempt to purchase the data on the dark web that had been stolen in the August 2021 breach.[47]   In the unsealed indictment, federal prosecutors disclosed the company hired a third party to purchase a sample of the data for an amount of Bitcoin valued at approximately $50,000.[48]   After concluding that the sample data was legitimate, the third party then purchased the rest of the database for an amount of Bitcoin valued at approximately $150,000.[49]   While the "agreement was for 'SubVirt' to then destroy his copy of the database . . . it appears the co-conspirators continued to attempt to sell the databases after the third-party's purchase."[50]

49.     The hackers claim to have taken multiple databases from Defendant totaling approximately 106 GB of data.[51]   They claim that "one of those databases holds the name, date of birth, SSN, drivers license information, plaintext security PIN, address and phone number of 36 million Defendant customers in the

---

[44] Joseph Cox, *Defendant Investigating Claims of Massive Customer Data Breach*, Motherboard (Aug. 15, 2021), available at https://www.vice.com/en/article/akg8wg/tmobile- investigating-customer-data-breach-100-million.
[45] *Id.* (emphasis added)
[46] *Id.*
[47] *United States of America v. Coelho*, Case No. 1:21-cr-114, Doc. 12, Indictment ¶¶ 33- 34 (E.D. Va. March 15, 2022).
[48] *Id.*
[49] *Id.*
[50] *United States of America v. Coelho*, Case No. 1:21-cr-114, Doc. 18, Affidavit in Support of Request for Extradition ¶ 33 (E.D. Va. March 17, 2022).
[51] Lawrence Abrams, *Hacker Claims to Steal Data of 100 Million Defendant Customers*, BleepingComputer (Aug. 15, 2021), available at https://www.bleepingcomputer.com/news/security/hacker-claims-to-steal-data-of-100-million-t-mobile-customers/.

United States – all going back to the mid-1990s."[52]  The hackers also claim to have taken a database that "includes credit card numbers with eight digits of the cards obfuscated."[53]

50.    The databases stolen, according to the hackers, include Defendant's customer relationship management database and Defendant's entire International Mobile Equipment Identity ("IMEI") history database going back to 2004.[54]  As explained in more detail below, IMEPlaintiff numbers, along with International Mobile Subscriber Identity ("IMSI") numbers, are used to identify a cell phone on a mobile network.

51.    Moreover, the original RaidForums post offering to sell a subset of the data claimed that it included 124 million entries.[55]  The hacker told *Motherboard* that he had obtained Defendant's "[f]ull customer info"[56] and told *BankInfoSecurity* that "[e]verything was stolen."[57]

52.    Defendant has admitted that account data for more than 54 million current, former, or prospective customers was compromised in the August 2021 breach, falling into three primary groups.[58]

53.    According to Defendant, the largest group of compromised individuals consists of "about 40 million" former or prospective Defendant customers, whose names, dates of birth, driver's licenses, and Social Security Numbers were compromised.[59]

54.    The second largest group, according to Defendant, consists of 7.8 million current Defendant postpaid customers, who had his names, dates of birth, driver's licenses, and Social Security Numbers compromised, along with his phone numbers, IMEI numbers, and IMSI numbers.[60]

55.    The third largest group, per Defendant, consists of "another 5.3 million" current postpaid

---

[52] Brian Krebs, *Defendant Investigating Claims of Massive Data Breach*, KrebsOnSecurity (Aug. 16, 2021).

[53] *Id.*

[54] Lawrence Abrams, *Hacker Claims to Steal Data of 100 Million Defendant Customers,* BleepingComputer (Aug. 15, 2021).

[55] Brian Krebs, *Defendant Investigating Claims of Massive Data Breach*, KrebsOnSecurity (Aug. 16, 2021).

[56] Joseph Cox, *Defendant Investigating Claims of Massive Customer Data Breach*, Motherboard (Aug. 15, 2021).

[57] Jeremy Kirk, *T-Mobile USA Investigates Possible Data Breach*, BankInfoSecurity (Aug. 16, 2021).

[58] *T-Mobile Shares Updated Information Regarding Ongoing Investigation into Cyberattack* (Aug. 20, 2021), available at https://www.t-mobile.com/news/network/additional- information-regarding-2021-cyberattack-investigation.

[59] *Id.*

[60] *Id.*

customers who had "one or more associated customer names, addresses, date of births, phone numbers, IMEIs and IMSIs illegally accessed."[61]

56.     Additionally, several smaller groups included: (1) approximately 667,000 former Defendant customers whose names, phone numbers, addresses, and dates of birth were compromised; (2) approximately 850,000 current prepaid customers whose names, phone numbers, and account PINs were compromised; and (3) 52,000 Metro by Defendant accounts whose names were compromised.[62]

57.     Defendant also admitted that an unidentified number of phone numbers, IMEI, and IMSI numbers were compromised.[63]

58.     In November 2021, months after its initial disclosure in August, Defendant disclosed in an SEC filing that its "investigation also identified approximately 26.0 million *additional* individuals" whose "names, dates of birth and, in many cases, addresses" were "taken, but for whom individual notifications were not required under state and federal law in light of the types of information taken."[64]

59.     This additional disclosure suggests that Defendant itself still does not know the full extent of its own August 2021 data breach.

**E.     Defendant Admitted That It Failed To Protect Customers' PII, And Then Compounded Its Failure By Providing Inadequate Notice To Those Impacted, Including Plaintiff.**

60.     In announcing the August 2021 data breach, Defendant admitted that it "didn't live up to the expectations we have for ourselves to protect our customers" and said that "[k]nowing that we failed to prevent this exposure is one of the hardest parts of this event."[65]  Defendant CEO  Michael Sievert also told customers that "[o]n behalf of everyone at Team Magenta, Plaintiff want to  say we are truly sorry."[66]

61.     In recognition that Plaintiff will face fraud and identity theft as a result of Defendant's failure to

---

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] T-Mobile  US,  Inc.,  Quarterly  Report  (Form  10-Q)  (Nov.  2,  2021),  available  at  https://www.sec.gov/Archives/edgar/data/1283699/000128369921000169/tmus-20210930 htm (emphasis added).

[65] *The Cyberattack Against T-Mobile and Our Customers* (Aug. 27, 2021), available at https://www.t-mobile.com/news/network/cyberattack-against-tmobile-and-our-customers.

[66] *Id.*

protect his PII, Defendant posted on its website many things it was supposedly doing to protect "customers and those affected."[67] Specifically, Defendant offered its customers two years of identity protection services through McAfee's ID Theft Protection Service, but Plaintiff reviewed the link provided[68] and searched all over Defendant's website to no avail – it appears to be a hollow offer. As previously alleged, Defendant's repeated breaches have caused Plaintiff to purchase McAfee's services on his own, and he will need them for much longer than two years. Defendant also recommended that customers sign up for Defendant's free scam-blocking protection called Scam Shield, made Account Takeover Protection available for postpaid customers, and suggested that customers reset passwords and PINs.[69]

62.     But this effort to notify Plaintiff and others fell short of providing key information about the August 2021 breach. As evidenced by its submission to the Washington State Attorney General, Defendant's notices to those the company considered "impacted consumers" consisted of brief text messages with little substantive information.[70] For example, the notices provided to the "SSN Cohorts" – customers whose Social Security numbers were compromised – did *not* divulge to those customers that very piece of critical information:

**Legacy-Sprint Customers**

8/18/2021 - Legacy Sprint Postpaid SMS – Active Customers (SSN Cohort)

T-Mobile has determined that unauthorized access to some of your personal data has occurred. We have no evidence that your debit/credit card information was compromised. We take the protection of our customers seriously. We are taking actions to protect your T-Mobile account and we recommend that you take action to protect your credit. Read more here. t-mo.co/Protect

---

[67] *Id.*

[68] https://www.t-mobile.com/news/network/cyberattack-against-tmobile-and-our-customers.

[69] *The Cyberattack Against T-Mobile and Our Customers* (Aug. 27, 2021), available at https://www.t-mobile.com/news/network/cyberattack-against-tmobile-and-our-customers.

[70] *Letter from Defendant's Counsel to Washington State Attorney General's Office* (Feb. 22, 2022), available at https://agportal-s3bucket.s3.amazonaws.com/databreach/BreachA96.pdf

8/19/2021 - SMS to sub-set of T-Mobile Postpaid Customers (SSN Cohort)-re: updates on web site

< 456                    📞 Q ⋮

🟢 T-Mobile Alert:
More information
has been made
available on our
resource page
to help you take
action to protect
your credit. Visit
here to see new
information: https://
t-mo.co/Protect          9:56 AM

63.     These are but tow examples of the "text" message "notices" provided by Defendant to certain victims of the August 2021 breach, which failed to provide the very information needed by the victim to take action to protect themselves, including that the victim's Social Security number ("SSN") and other information had been compromised.

64.     In contrast, for victims whose SSNs were not impacted, Defendant promoted that point, but still did not provide recipients with the precise categories of PII that were impacted as to them. The following "text" message "notices" were provided to customers whose SSNs were purportedly not exfiltrated in the August 2021 breach:

8/21/2021 - Legacy Sprint Postpaid SMS – Active Customers (Non-SSN Cohort)

T-Mobile Update: T-Mobile has
determined that unauthorized
access to some of your information
has occurred, like name, phone
number and DOB. Importantly, we
have NO information that indicates
your SSN, personal financial or
payment information, credit/debit
card information, account numbers,
or account passwords were
accessed. We take the protection of
our customers seriously. Learn more
about practices that keep your
account secure and general
recommendations for protecting
yourself: t-mo.co/Protect

8/20, 8/24/2021 - SMS to T-Mobile Postpaid Customers (Non-SSN Cohort)



8/19/2021 - SMS to sub-set of T-Mobile Postpaid Customers (SSN Cohort)-re: updates on web site



65.      Where the text messages failed to be delivered, Defendant detailed in its letter to the Washington State Attorney General that it sent follow-up emails – none of which provided any more information than was provided in the above-detailed text messages.

66.      For non-customers, Defendant provided an email, which similarly did not provide any concrete information to recipients as to what elements of his PII had been impacted.

67.     Just as Defendant failed in its notice practices to the individuals the company identified as impacted by the August 2021 breach, Defendant failed to correctly identify all the former and postpaid customers who were impacted by the August 2021 breach to begin with.  Plaintiff was never directly notified by Defendant that his PII was exfiltrated in the August 2021 breach, and Defendant's counsel has (incorrectly) conveyed the message that Plaintiff's PII was not exfiltrated.  Plaintiff is not alone in refusing to take Defendant at its word that the company now knows with absolute certainty the complete list of individuals who were impacted by the August 2021 breach.  As alleged by class representatives in the pending class action against Defendant, Robert Taylor from Connecticut, Alexis Grant from the District of Columbia, Amber Wilhite from Georgia, Victoria Purnell from Georgia, Mona Honeycutt from Oklahoma, Kimberly Baney from Oregon, and John Ford from South Carolina all (1) did not receive a direct notification from Defendant and (2) averred specific facts supporting why they believed their PII was compromised in the August 2021 breach.[71]  Defendant's deficient notices compounded the harm suffered by Plaintiff and others, by failing to correctly identify the complete universe of impacted individuals and timely provide them with the very details necessary to protect themselves.

### F.    Defendant Has Consistently Downplayed and Subsequently Revised the Impact and Breadth of the Major August 2021 Data Breach.

68.     Just as Defendant has repeatedly allowed data breaches, the company has repeatedly been wrong about the full extent of the damage from those eight repeated data breaches.  As explained by Defendant:[72]

> We previously reported information from approximately 7.8 million current T-Mobile postpaid customer accounts that included first and last names, date of birth, SSN, and driver's license/ID information was compromised. We have now also determined that phone numbers, as well as IMEI and IMSI information, the typical identifier numbers associated with a mobile phone, were also compromised. Additionally, we have since identified another 5.3 million current postpaid customer accounts that had one or more associated customer names, addresses, date of births, phone numbers, IMEIs and IMSIs illegally

---

[71] Consolidated Consumer Class Action Complaint.

[72] https://www.t-mobile.com/news/network/additional-information-regarding-2021-cyberattack-investigation

accessed. These additional accounts did not have any SSNs or driver's license/ID information compromised.

69.     In court filings, Defendant has heretofore reported a number lower than its 105 million total customers – viz. 76.6 million  – as the full set of customers whose information was compromised in the August 2021 data breach.  Notably, Defendant also tries to exclude "customer financial information, credit card information, debit or other payment information" from the data compromised in the August 2021 data breach.[73]  However, the seller of the hacked data from the August 2021 data breach told Motherboard that as a result of T-Mobile's "awful security" it has "full customer info"  on over 100 million "T-Mobile USA" customers.

## G.  Several More Data Breaches Followed Major August 2021 Data Breach.

70.     There were more security incidents even after the major August 2021 data breach. In December 2021, Defendant disclosed that several customers had experienced SIM-swap attacks, stating: "We informed a very small number of customers that the SIM card assigned to a mobile number on their account may have been illegally reassigned or limited account information was viewed."[74]

71.     In April 2022 it was announced that members of the LAPSUS$ cybercrime group breached Defendant multiple times in March, stealing source code for a range of company projects and accessing employee accounts with access to Atlas, a powerful internal Defendant tool for managing customer accounts.[75]

72.     On January 5, 2023 a hacker accessed a trove of personal data belonging to 37 million customers. Defendants said that the "bad actor" started stealing the data, which includes "name, billing address, email, phone number, date of birth, T-Mobile account number and information such as the number of lines on the account and plan features," since November 25, 2022.[76]  Plaintiff asked Defendants as early as January

---

[73] Id.

[74] Lori Grunin, *Defendant Suffers Another, Smaller Data Breach*, CNET (Dec. 29, 2021), available at https://www.cnet.com/tech/mobile/t-mobile-reportedly-suffers-another-smaller-data- breach/.

[75] Brian Krebs, *Leaked Chats Show LAPSUS$ Stole Defendant Source Code*, KrebsOnSecurity (April 22, 2022), available at https://krebsonsecurity.com/2022/04/leaked- chats-show-lapsus-stole-t-mobile-source-code/.

[76]                                                          https://techcrunch.com/2023/01/19/t-mobile-data-

19, 2023 whether he was a victim of the January 5, 2023 hack, but Defendants ignored Plaintiff's request. Plaintiff then repeatedly asked Defendants over the next ten weeks, and Defendants have thus far only provided the most bare information confirming that Plaintiff's PII was hacked but not providing the specifics.

**H.  Defendant Failed To Comply With Regulatory Guidance And Industry- Standard Cybersecurity Practices.**

73.  Defendant's long and well-documented history of data security failures is attributable to its failure to comply with state and federal laws and requirements as well as industry standards governing the protection of PII.

74.  For example, at least 24 states have enacted laws addressing data security practices that require that businesses that own, license or maintain PII to implement and maintain "reasonable security procedures and practices" and to protect PII from unauthorized access. California is one such state and requires that "[a] business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use modification or disclosure." Cal. Civ. Code § 1798.81.5(b).

75.  Defendant also failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and industry-standard cybersecurity practices. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies like Defendant. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. The FTC has made clear that protecting sensitive customer data should factor into virtually all business decisions.

76.  The FTC recommends:

•    limiting access to customer information to employees who have a business reason to see it;

---

breach/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAJdd-ypv_0QWj_Up2fknrgRUABkwOwB6Hbxgyp3YSeKCrvpRxWq_qFCtEwQktqlRuROI_fUYw085H26qY1BewnpAWisEUkCn85JJcmqBDOYwMG8u9gEfd7JALmoNnmq-tgz-2NHvIWLcY7v0lwUXHn5EbKqD1tqlQgaO4kLrTQ8r

- keeping customer information in encrypted files provides better protection in case of theft;

- maintaining up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;

- using appropriate oversight or audit procedures to detect the improper disclosure or theft of customer information;

- monitoring both in- and out-bound transfers of information for indications of a compromise, such as unexpectedly large amounts of data being transmitted from your system to an unknown user; and,

- monitoring activity logs for signs of unauthorized access to customer information.[77]

77. The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[78]

78. In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[79] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

79. The FTC recommends that businesses delete payment card information after the time needed to process a transaction; restrict employee access to sensitive customer information; require strong passwords

---

[77] Federal Trade Commission, *Financial Institutions and Customer Information: Complying with the Safeguards Rule*, available at https://www.ftc.gov/tips-advice/business- center/guidance/financial-institutions-customer-information-complying.

[78] Federal Trade Commission, *Start With Security* at 2, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[79] Federal Trade Commission, *Protecting PII: A Guide for Business*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal- information.pdf.

be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third parties with access to sensitive information use reasonable security measures.

80.     The FTC also recommends that companies use an intrusion detection system to immediately expose a data breach; monitor incoming traffic for suspicious activity that indicates a hacker is trying to penetrate the system; monitor for the transmission of large amounts of data from the system; and develop a plan to respond effectively to a data breach in the event one occurs.

81.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet his data security obligations.

82.     The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data.

83.     Defendant was aware of its obligations to protect its customers' PII and privacy before and during the August 2021 breach and other breaches during Plaintiff's tenure as a customer, yet failed to take reasonable steps to protect customers' PII from unauthorized access. In this case, Defendant was at all times fully aware of its obligation to protect the PII of Defendant's current customers, such as Plaintiff. Defendant was also aware of the significant repercussions if it failed to do so because Defendant collected PII from millions of consumers and it knew that this PII, if hacked, would result in injury to consumers, including Plaintiff.

84.     Based upon the known details of the August 2021 breach and how it occurred, Defendant also failed to fully comply with industry-standard cybersecurity practices, including, but not limited to, proper firewall configuration, network segmentation, secure credential storage, rate limiting, user-activity monitoring, data-loss prevention, and intrusion detection and prevention.

### I. **The Effect Of Defendant's Eight Repeated Data Breaches On Plaintiff**

85.     Plaintiff's PII was stolen in at least two of Defendant's eight data breaches during Plaintiff's tenure as a customer.  Defendant's failure to keep Plaintiff's PII secure has severe ramifications. Given the sensitive nature of Plaintiff's PII stolen in at least two of Defendant's eight data breaches during Plaintiff's tenure with Defendant – names, addresses, zip codes, phone numbers, email addresses, dates of birth, Social Security numbers, and driver's license numbers – hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an ongoing, increased and substantial risk of further injury including identity theft and related cybercrimes due to Defendant's eight repeated data breaches.

86.     In fact, the PII stolen in the August 2021 breach is already being used to target Defendant's customers for phishing scams. The New Jersey Office of Homeland Security issued an alert on April 14, 2022, that Defendant's customers were being targeted by a "SMiShing campaign," or phishing over text-messaging scam.[80]  The agency concluded that Defendant customers "were likely targeted, in part, due to past breaches that affected Defendant and exposed various types of sensitive information."[81]

87.     There is strong evidence that Plaintiff's PII from at least two of Defendant's eight data breaches is circulating on the dark web – see Plaintiff's specific statement of facts above. Additionally, numerous state attorneys general have notified consumers that the PII of millions of individuals from the August 2021 breach has appeared on the dark web.[82]   Identity protection services have likewise alerted individual consumers to the presence of their PII on the dark web, attributing the compromised PII to

---

[80] New SMiShing Campaign Targets Defendant Customers, N.J. Cybersecurity & Comm. Integration Cell (Apr. 14, 2022), available at https://www.cyber nj.gov/alerts-advisories/new- smishing-campaign-targets-t-mobile-customers.
[81] *Id.*

[82] Mark Huffman, *Stolen Defendant Data Found for Sale on the Dark Web*, Consumer Affairs (Mar. 3, 2022), available at https://www.consumeraffairs.com/news/stolen-t-mobile-data- found-for-sale-on-the-dark-web-030322 html; *Consumer Alert: Take Action if You Were Impacted By the 2021 Defendant Data Breach*, N.C. Atty. Gen. (Mar. 2, 2022), available at https://ncdoj.gov/consumer-alert-take-action-if-you-were-impacted-by-the-2021-t-mobile-data- breach/; *AG Slatery Urges Data Protection for Those Impacted by the Massive 2021 Defendant Breach*, Tenn. Atty. Gen. (Mar. 2, 2022), available at https://www.tn.gov/attorneygeneral/news/2022/3/2/pr22-06 html; *Attorney General Knudsen Alerts Consumers Impacted By The Massive 2021 Defendant Data Breach To Take Steps To Protect Their PII*, Mont. Atty. Gen. (Mar. 2, 2022), available at https://dojmt.gov/attorney- general-knudsen-alerts-consumers-impacted-by-the-massive-2021-t-mobile-data-breach-to-take- steps-to-protect-his-personal-information/.

Defendant's breaches.[83]

88.     It is no wonder Plaintiff's stolen PII is circulating on the dark web, as it is highly valuable. Malicious actors use PII to, among other things, gain access to consumers' bank accounts, social media, and credit cards. Malicious actors can also use consumers' PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities."[84]

89.     Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen PII, meaning individuals can be the victim of several cybercrimes stemming from a single data breach. Moreover, although elements of some of Plaintiff's data may have been compromised in other data breaches, the fact that the August 2021 breach, for example, centralized the PII and identified the victims as Defendant's current, former, or prospective customers materially increases the risk to Plaintiff.[85]

90.     The U.S. Government Accountability Office determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[86]  Moreover, there is often

---

[83] McAfee Alerted Me My Social Security # Was Found As Part of Defendant Breach, Defendant Community Site, available at https://community.t-mobile.com/accounts-services-4/mcafee- alerted-me-his-social-security-was-found-as-part-of-tmobile-breach-41128 (last visited May 11, 2022); *Identity Theft Protection by McAfee Detected a Match to Your Social Security Number*, Reddit (Feb. 3, 2022), available at https://www.reddit.com/r/tmobile/comments/sjmhuf/identity_theft_protection_by_mcafee_detect ed_a/ (last visited May 11, 2022); *Just Received a Flood of Emails from McAfee About his SS# Found on the Dark Web with Defendant as the Potential Source of the Leak*, Reddit (Feb. 1, 2022),

https://www.reddit.com/r/tmobile/comments/si3wxp/just_received_a_flood_of_emails_from_mc afee_about/ (last visited May 11, 2022).

[84] A criminal combines real and fake information to create a new "synthetic" identity, which is used to commit fraud.

[85] Jeremy Kirk, *Defendant Probes Attack, Confirms Systems Were Breached*, (Aug. 17, 2021).

[86] U.S. Gov't Accountability Off., GAO-07-737, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* 42 (June 2007), available at

significant lag time between when a person suffers harm due to theft of his PII and when he discover the harm. Plaintiff will therefore need to spend time and money to continuously monitor his accounts for years to ensure his PII obtained in Defendant's repeated breaches is not used to harm him. Plaintiff thus has been harmed in the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's eight repeated data breaches. In other words, Plaintiff has been harmed by the value of identity protection services he must purchase in the future to ameliorate the risk of harm he now face due to Defendant's repeated breaches during Plaintiff's three-year tenure with the company (with more breaches likely continuing when Plaintiff is a former customer).

91.     Plaintiff has also realized harm in the lost or reduced value of his PII. Defendant admits the PII compromised in the August 2021 breach and its other breaches is valuable. As discussed above, Defendant collects, retains, and uses Plaintiff's PII to increase profits through predictive and other targeted marketing campaigns. Plaintiff's PII is not only valuable to Defendant, but Plaintiff also places value on his PII based on his understanding that his PII is a financial asset to companies that collect it.[87]

92.     Plaintiff has also been harmed and damaged in the amount of the market value of the hacker's access to Plaintiff's PII from one or several of Defendant's eight data breaches during Plaintiff's tenure as a customer that were permitted by Defendant without Plaintiff's authorization. This market value for access to PII can be determined by reference to both legitimate and illegitimate markets for such information.

93.     Moreover, Plaintiff values the privacy of this information and expects Defendant to allocate enough resources to ensure it is adequately protected. Plaintiff would not have done business with Defendant, provided his PII and payment card information (for autopay of his monthly bill), or paid the

---

https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-07-737/html/GAOREPORTS-GAO-07-737 htm (last visited May 8, 2022).

[87] *See, e.g.*, *Ponemon Institute, LLC, Privacy and Security in a Connected Life: A Study of US, European and Japanese Consumers* at p. 14 (March 2015) (explaining that 53% of respondents "believe personal data is a financial asset similar to traded goods, currencies or commodities" and valuing, as but one example, his Social Security number at $55.70), available at https://docplayer net/836701-Privacy-and-security-in-a-connected-life-a-study-of-us- european-and-japanese-consumers html.

same prices for Defendant's goods and services had he known Defendant did not implement reasonable security measures to protect his PII.[88]  Plaintiff reasonably expected that the postpaid payments he made to Defendant incorporated the costs to implement reasonable security measures to protect his PII. And because consumers like Plaintiff value data privacy and security, companies with robust data security practices can command higher prices than those who do not. As a result, Plaintiff did not receive the benefit of his bargain with Defendant because he paid a value for services he expected but did not receive.

94.      Plaintiff may also fall victim to a harm unique to the August 2021 breach – "SIM swap" fraud. A SIM swap is scheme wherein a hacker gains control of a victim's mobile phone number and service in order to intercept communications, including text messages, intended for the victim. The hackers then use that phone number as a key to access and take over the victim's other digital accounts, such as email, file storage, and financial accounts.

95.      Customers often request SIM swaps for legitimate reasons when they obtain new phones or switch mobile carriers. However, Defendant does not have adequate protections in place to prevent fraudulent SIM swap attacks from occurring, and the data released in a data breach makes it much more likely that a Defendant customer will become a victim of a SIM swap attack. In a fraudulent SIM swap, a would-be hacker contacts Defendant and impersonates the legitimate customer. This impersonation is made substantially easier when directed at Defendant customers, because hackers now have access to troves of data about Defendant customers, including his full names, addresses, email addresses, telephone numbers, and other data.

96.      Following a fraudulent SIM swap (1) the legitimate subscriber (now victim)'s phone loses connection to the wireless network, meaning they cannot use the wireless network to call, text, or use the internet, and they are inhibited in their attempts to warn their wireless carrier of the fraud; and (2) all phone calls and text messages that would normally have gone to the victim's phone now go to the imposter's

---

[88] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 11, 2016), https://www.fireeye.com/current-threats/cost-of-a-data-breach/wp-real-cost-data-breaches html (noting approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less PII to organizations that suffered a data breach).

phone. If the imposter has even one other data point, such as an email address, he can often use the phone number to get into the victim's email account through the "Forgotten Password" feature, or by using the victim's legitimate phone number to pass two-factor authentication. Because customer email addresses were compromised in the August 2021 breach (and connected to a Defendant customer), this data is now readily available to would-be SIM swap hackers.

97.     Given Defendant's failure to protect Plaintiff's PII despite multiple data breaches preceding and during Plaintiff's three-year period with Defendant, Plaintiff has a significant and cognizable interest in obtaining certain injunctive and equitable relief (in addition to any monetary damages, restitution, or disgorgement) that protects him from suffering further harm, as his PII remains in Defendant's possession.

98.     In sum, Plaintiff was injured as follows: (i) theft of his PII and the resulting loss of privacy rights in that information; (ii) improper disclosure of his PII; (iii) loss of value of his PII; (iv) the lost value of access to Plaintiff's PII permitted by Defendant; (v) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's repeated breaches; (vi) Defendant's retention of profits attributable to Plaintiff's PII that Defendant failed to adequately protect; (vii) the ongoing, increased threat of fraud and identity theft, including the economic and non-economic impacts that flow therefrom; (viii) the increased risk of identity theft, including the economic and non-economic impacts that flow therefrom; (ix) ascertainable out-of-pocket expenses, including past and future payments for ID theft protection services, and the value of his time allocated to fixing or mitigating the effects of Defendant's eight data breaches; (x) overpayments to Defendant for goods and services purchased, as Plaintiff reasonably believed a portion of the sale price would fund reasonable security measures that would protect his PII, which was not the case; (xi) arbitration and attorney fees in pursuing his claims against Defendant; and (xii) nominal damages.

## **CLAIMANT'S CAUSES OF ACTION**

99.     First, Plaintiff asserts claims against Defendant for declaratory relief in Count 1 and declaratory relief and rescission in Count 2 that he requests all be decided by the Court prior to a jury trial on the

remaining 14 causes of action.  Additionally, Plaintiff asserts claims against Defendant for violations of the California Consumer Legal Remedies Act (Count 3), the California Unfair Competition Act (Count 4), California Consumer Privacy Act (Count 5), the California Customer Records Act (Count 6), gross negligence and negligence (Count 7), negligence *per se* (Count 8), breach of confidence (Count 9), intrusion upon seclusion (Count 10), breach of express contract (Count 11), breach of implied contract (Count 12), negligent misrepresentation (Count 13), breach of fiduciary duty (Count 14), violations of the Stored Communications Act (Count 15), and unjust enrichment (Count 16).

## COUNT 1

### DECLARATORY JUDGMENT (NO MUTUAL ASSENT)

100.    Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

101.    The parties never formed a contract with the Terms and Conditions for lack of mutual assent.

102.    The applicable set of Terms and Conditions were ambiguous for several reasons, including the absence of a provision to guide conflicts between the Terms and Conditions and the AAA rules.  These two authorities conflict in several germane areas, and it was impossible for a consumer to know what he or she was agreeing to regarding those areas of conflict.

103.    Defendants have disregarded the Terms and Conditions and instead relied on the AAA rules whereas Plaintiff has complied with the Terms and Conditions.

104.    Defendants were aware of this ambiguity and could and should have prevented it as the corporate drafter of a consumer adhesion contract.  In subsequent versions of the Terms and Conditions, Defendants expressly provided that the Terms and Conditions would control in the event of a conflict with the AAA rules.

105.    An actual and justiciable controversy exists between Plaintiff and Defendant that would be resolved by granting Plaintiff its requested declaratory relief.

106.    Plaintiff seeks declaratory relief under 28 U.S.C. § 2201, and Plaintiff respectfully requests an order declaring that the parties never formed a contract with the Terms and Conditions for lack of mutual

assent.

107.    Plaintiff also seeks recovery of all other costs and fees to which he is entitled under this count, including attorney fees and costs.

<u>COUNT 2</u>

**DECLARATORY JUDGMENT & RESCISSION**

108.    Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

109.    Alternatively, the Terms and Conditions include a "Class Action Waiver" that states, in pertinent part, "You and we each agree that any proceedings, whether in arbitration or court, will be conducted only on any individual basis and not as a class, representative, mass, or consolidated action.  If we believe that any claim you have filed in arbitration or court is inconsistent with this limitation, then you agree that we may seek an order from a court determining whether your claim is within the scope of this class action waiver."[89]

110.    Defendant has already participated in a judicial "proceeding" in a non-individual basis; Plaintiff never has but would like to pursue a class action or mass arbitration against Defendant.  Specifically, Defendant has participated in a judicial class action settlement in case number 4:21-md-03019-BCW in the Federal District Court for the Western District of Missouri.[90]

111.    By participating in this judicial class action and entering into a final settlement, Defendant has repudiated or committed an anticipatory breach of the "Class Action Waiver" before time for performance in Defendant's contract with Plaintiff.  Defendant's refusal to perform its obligations under the "Class Action Waiver" was unconditional and the renunciation was complete.

112.    Plaintiff promptly accepts Defendant's repudiation of the "Class Action Waiver" and considers the "Class Action Waiver" to be at an end.

113.    Plaintiff also promptly accepts Defendant's repudiation of the arbitration provision and considers

---

[89] https://www.t-mobile.com/responsibility/legal/terms-and-conditions

[90] https://www.t-mobilesettlement.com

the arbitration provision to be at an end.

114.   An actual and justiciable controversy exists between Plaintiff and Defendant that would be resolved by granting Plaintiff its requested declaratory relief.

115.   Plaintiff seeks declaratory relief under 28 U.S.C. § 2201, and Plaintiff respectfully requests an order declaring that Defendant has repudiated the "Class Action Waiver" and arbitration provisions by participating in the judicial class-action matter and finalizing settlement; Plaintiff has properly accepted Defendant's repudiation; and modifying the Terms and Conditions such that the "Class Action Waiver" and arbitration provisions are rescinded and no longer in effect.

116.   Plaintiff also seeks recovery of all other costs and fees to which he is entitled under this count, including attorney fees and costs.

## COUNT 3

## CALIFORNIA CONSUMER LEGAL REMEDIES ACT,

### Cal. Civ. Code §§ 1750, *et seq.*

117.   Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

118.   The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq. ("CLRA") is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

119.   Defendant is a "person" as defined by Civil Code §§ 1761(c) and 1770, and has provided "services" to Plaintiff as defined by Civil Code §§ 1761(b) and 1770.

120.   Plaintiff is a "consumer" as defined by Civil Code §§ 1761(d) and 1770, and has engaged in a "transaction" as defined by Civil Code §§ 1761(e) and 1770.

121.   Defendant's acts and practices in selling Plaintiff wireless and data cellphone services with grossly inadequate data privacy protection were intended to and did result in the sales of products and services to Plaintiff in violation of Civil Code § 1770, including:

a.   Representing that goods or services have characteristics that they do not  have;

b.   Representing that goods or services are of a particular standard, quality, or grade when they were not;

c.   Advertising goods or services with intent not to sell them as advertised;  and

d.   Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

126.   Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' PII.

127.   Had Defendant disclosed to Plaintiff and other consumers that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to secure Plaintiff's business.  Additionally, Defendant would have been unable to continue in business, and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant was trusted with sensitive and valuable PII regarding millions of consumers, including Plaintiff. Defendant accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff acted reasonably in relying on T- Mobile's misrepresentations and omissions, the truth of which he could not have discovered.

128.   A violation of Civil Code § 1770 allows a consumer "who suffers any damage as a result" to obtain various damages under Civil Code § 1780.

129.   As a direct and proximate result of Defendant's violations of California Civil Code § 1770, Plaintiff has suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; new and additional charges from a replacement wireless carrier; time and expenses related to monitoring his financial accounts for fraudulent activity; an ongoing, increased risk of  fraud and identity theft; loss of value of his PII; overpayment for Defendant's services; loss of the value of access to his PII; and the value of identity protection services made necessary by Defendant's conduct.

130.　The legal remedies Plaintiff seeks for the injuries he incurred as a result of Defendant's past failures to protect his PII are inadequate.

131.　Pursuant to Civil Code § 1782(d), Plaintiff seeks an order enjoining the acts and practices described above.　Plaintiff also has complied with the notice provision of Civil Code § 1782(a), and Plaintiff requests all monetary and non-monetary relief allowed by law, including actual and punitive damages, attorneys' fees, and costs under the CLRA.

**COUNT 4**

**CALIFORNIA UNFAIR COMPETITION ACT,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

132.　Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

133.　Defendant is a "person" as defined by Cal. Bus. & Prof. Code §17201.

134.　Defendant violated Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

135.　Defendant's "unfair" acts and practices include:

　　　a.　Defendant failed to implement and maintain reasonable security measures to protect Plaintiff's PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of at least two of Defendant's eight data breaches during Plaintiff's tenure as a customer.

　　　b.　Defendant failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents, as described herein. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiff and other consumers, whose PII has been compromised.

　　　c.　Defendant's failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate

security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45, California's Consumer Records Act, Cal. Civ. Code § 1798.81.5, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.100.

d.  Defendant's failure to implement and maintain reasonable security measures also resulted in substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Defendant's grossly inadequate security, consumers could not have reasonably avoided the harms that Defendant caused.

e.   Defendant engaged in unlawful business practices by violating Cal. Civ. Code § 1798.82.

136.    Defendant has engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1780, et seq., the FTC Act, 15 U.S.C. § 45, and California common law.

137.    Defendant's unlawful, unfair, and deceptive acts and practices include:

a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's PII, which was a direct and proximate cause of the eight data breaches during Plaintiff's tenure as a customer;

b.  Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the eight data breaches during Plaintiff's tenure as a customer;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the eight data

breaches during Plaintiff's tenure as a customer;

    d.    Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's PII, including by implementing and maintaining reasonable security measures;

    e.    Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

    f.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's PII; and

    g.    Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, California's Consumer Records Act, Cal. Civ. Code §§ 1798.80, et seq. and 1798.81.5, which was a direct and proximate cause of the eight data breaches during Plaintiff's tenure as a customer.

138.    Defendant's representations and omissions were material because they deceived Plaintiff about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' PII. Plaintiff would not have purchased wireless and data from Defendant if he knew the truth about Defendant's representations and omissions.

139.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff was injured and suffered monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring his financial accounts for fraudulent activity; new and additional charges from a replacement wireless carrier; an ongoing, increased risk of fraud and identity theft; loss of value of his PII; overpayment for Defendant's services; loss of the value of access to his PII; and the value of identity protection services made necessary by

Defendant's conduct.

140.    Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's rights. Defendant's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

141.    The legal remedies Plaintiff seeks for the injuries he incurred as a result of Defendant's past unfair acts and practices regarding Plaintiff's PII are inadequate.

142.    Plaintiff seeks all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of his PII; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT 5

### CALIFORNIA CONSUMER PRIVACY ACT ("CCPA"),
### Cal. Civ. Code §§ 1798.150, *et seq.*

143.    Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

144.    Plaintiff was a resident of California from October 2015 through October 2021.

145.    Defendant is a corporation organized or operated for the profit or financial benefit of its owners with annual gross revenues over $80 billion. Defendant collects consumers' personal information ("PII" for purposes of this Count) as defined in Cal. Civ. Code § 1798.140.

146.    Defendant violated § 1798.150 of the CCPA by failing to prevent Plaintiff's nonencrypted PII from unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

147.    Defendant has a duty to implement and maintain reasonable security procedures and practices to protect Plaintiff's PII. As detailed herein, Defendant failed to do so.

148.    As a direct and proximate result of Defendant's acts, Plaintiff's PII, potentially including his credit

card numbers on autopay, social security number, phone number, names, addresses, unique IMEI numbers, and driver's license information, was subjected to unauthorized access and exfiltration, theft, or disclosure.

149.    Plaintiff seeks injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards his PII by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold Plaintiff's PII even after Plaintiff left T-Mobile for another carrier. Plaintiff has an interest in ensuring that his PII is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information, as evidenced by its multiple data breaches.

150.    As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of the information to protect the PII under the CCPA.

151.    A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant and third parties with similar inadequate security measures.

152.    Plaintiff seeks actual pecuniary damages suffered as a result of Defendant's violations.

### COUNT 6

**CALIFORNIA CUSTOMER RECORDS ACT,**
**Cal. Civ. Code §§ 1798.80, *et seq.***

153.    Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

154.    "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the PII from unauthorized access, destruction, use, modification, or disclosure."

155.    Defendant is a business that owns, maintains, and licenses personal information (or "PII"), within

the meaning of Cal. Civ. Code § 1798.81.5, about Plaintiff.

156.     Businesses that own or license computerized data that includes PII, including Social Security numbers, are required to notify California residents when their PII has been acquired (or is reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of PII that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

157.     Defendant is a business that owns or licenses computerized data that includes PII as defined by Cal. Civ. Code § 1798.82.

158.     Plaintiff's PII includes PII as covered by Cal. Civ. Code § 1798.82.

159.     Because Defendant should have reasonably believed that Plaintiff's PII was acquired by unauthorized persons during at least two of Defendant's eight data breaches during Plaintiff's tenure as a customer, Defendant had an obligation to disclose to Plaintiff the data breaches in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

160.     Defendant failed to fully disclose to Plaintiff material information about the data breaches in which Defendant should have reasonably believed that Plaintiff's PII was acquired by unauthorized persons. This includes failing to notify Plaintiff about the types of his PII impacted.

161.     By failing to disclose to Plaintiff in a timely and accurate manner the data breaches in which Defendant should have reasonably believed Plaintiff's PII was acquired by unauthorized persons, Defendant violated Cal. Civ. Code § 1798.82.

162.     As a direct and proximate result of Defendant's violations of the Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiff suffered damages, as described above.

163.     Plaintiff seeks relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

## COUNT 7

### GROSS NEGLIGENCE AND NEGLIGENCE

164.     Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

165.     Defendant required Plaintiff to submit sensitive PII in order to obtain its services.

166.     Defendant owed a duty to Plaintiff to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting his PII in its possession from being compromised, lost, stolen, accessed or misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's PII in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

167.     Defendant's duty to use reasonable care arose from several sources, including but not limited to those described herein.

168.     Defendant had common law duties to prevent foreseeable harm to Plaintiff. These duties existed because Plaintiff was a foreseeable and probable victim of any inadequate security practices. Not only was it foreseeable that Plaintiff would be harmed by Defendant's failure to protect his PII because hackers routinely attempt to steal such information and use it for nefarious purposes, Defendant knew that it was more likely than not Plaintiff would be harmed if it allowed such a breach, and especially if it allowed repeated breaches.

169.     Defendant's duty to use reasonable security measures also arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff, on the other hand. The special relationship arose because Plaintiff entrusted Defendant with his PII as part of purchasing and signing-up for the products and services Defendant offers as a major telecommunications company. Defendant alone could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the repeated breaches.

170.     Defendant's duty also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"),

15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII by companies such as Defendant. Various FTC publications and data security breach orders further form the basis of Defendant's duty. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

171.    Defendant's duty also arose from Defendant's unique position as the second largest wireless carrier in the United States. As a telecommunications company, Defendant holds itself out as a protector of consumer data, and thereby assumes a duty to reasonably protect the data that was provided to it by Plaintiff. Defendant has stated: "You trust [Defendant] to connect you to the world every day, and we're working hard to earn a place in your heart. A big part of that is maintaining your privacy."[91] Because of its role as the second largest wireless carrier, Defendant was in a unique and superior position to protect against the harm suffered by Plaintiff as a result of Defendant's repeated breaches.

172.    Defendant admits that it has a responsibility to protect consumer data, that it is entrusted with this data, and that it did not live up to its responsibility to protect the PII at issue here.

173.    With regard to network security, Defendant further acknowledges that it "use[s] administrative, technical, contractual, and physical safeguards designed to protect your data  while it is under our control."[92]

174.    After so many breaches, Defendant knew or should have known that its computing systems and data storage architecture were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing confidential PII.

175.    Defendant also had a duty to safeguard the PII of Plaintiff and to promptly notify him of a breach because of California laws and statutes that require Defendant to reasonably safeguard sensitive PII, as detailed herein.

---

[91] *Defendant's Privacy Policy* (effective May 5, 2021), available at https://web.archive.org/web20210816234224/https://www.t-mobile.com/privacy-center/our- practices/privacy-policy
[92] In February 2022, Defendant modified its policy to omit the language "while it is under our control." *Defendant's Privacy Policy* (effective Feb. 23, 2022), available at https:// www.t- mobile.com/privacy-center/our-practices/privacy-policy.

176.     Timely, adequate notification was required, appropriate and necessary so that, among other things, Plaintiff could take appropriate measures to freeze or lock his credit profiles, avoid unauthorized charges to his credit card account, cancel or change usernames and passwords on compromised accounts, monitor his account information and credit reports for fraudulent activity, contact his bank and other financial institutions that issue his credit cards, obtain credit monitoring services, and take other steps to mitigate or ameliorate the damages caused by Defendant's misconduct.

177.     Defendant breached the duties it owed to Plaintiff described above and thus was negligent. Furthermore, Defendant acted with wanton disregard for the security of Plaintiff's PII and thus was grossly negligent. Defendant breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiff; (b) detect the breaches while they were ongoing; (c) maintain security systems consistent with industry standards during the three-year period Plaintiff was Defendant's customer and suffered repeated breaches; (d) comply with regulations protecting the PII at issue during the three-year period Plaintiff was Defendant's customer and suffered repeated breaches; and (e) disclose in a timely and adequate manner that Plaintiff's PII in Defendant's possession had been or was reasonably believed to have been, stolen or compromised.

178.     But for Defendant's wrongful, grossly negligent, and negligent breach of its duties owed to Plaintiff, his PII would not have been compromised and sold on the dark web.

179.     Especially after so many repeated breaches, Defendant's failure to take proper security measures to protect the sensitive PII of Plaintiff created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiff's PII.

180.     Plaintiff was a foreseeable victims of Defendant's inadequate data security practices, and it was also foreseeable that Defendant's failure to provide timely and adequate notice of the repeated breaches including the August 2021 breach would result in injury to Plaintiff as described in this Complaint.

181.     As a direct and proximate result of Defendant's gross negligence and negligence, Plaintiff has been injured and is entitled to damages, including punitive damages for the grossly negligent conduct, in

an amount to be proven at trial. Such injuries include the following: ongoing, increased risk of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; new and additional charges from a replacement wireless carrier; loss of the value of his privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring and identity theft insurance; time spent in response to the repeated breaches reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating and responding to fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to his PII permitted by Defendant; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's repeated breaches; lost benefit of his bargains and overcharges for services; nominal and general damages and other economic and non-economic harm.

## COUNT 8

## NEGLIGENCE PER SE

182.    Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

183.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the Federal Trade Commission ("FTC"), the unfair act or practice by companies such as Defendant of failing to use reasonable measures to protect PII.

184.    The FTC publications and orders also form the basis of Defendant's duty.

185.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given Defendant's history of repeated breaches and the nature and amount of PII it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving a company as large as Defendant, including, specifically the damages that would result to Plaintiff.

186.   In addition, under California data security statutes, Defendant had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's PII.

187.   Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

188.   Plaintiff is a consumer within the class of persons Section 5 of the FTC Act was intended to protect.

189.   The harm that has occurred is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses that, as a result of his failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff.

190.   Defendant breached its duties to Plaintiff under the FTC Act and California data security statutes by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's PII.

191.   Plaintiff was a foreseeable victim of Defendant's violations of the FTC Act and California data security statutes. Especially after so many repeated breaches, Defendant knew or should have known that its failure to implement reasonable measures to protect and secure Plaintiff's PII would cause damage to Plaintiff.

192.   But for Defendant's violation of the applicable laws and regulations, Plaintiff's PII would not have been accessed by unauthorized parties in at least two of Defendant's eight data breaches during Plaintiff's tenure as customer.

193.   As a direct and proximate result of Defendant's negligence *per se*, Plaintiff has been injured and is entitled to damages in an amount to be proven at trial. Such injuries include the following: ongoing, increased risk of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; new and additional charges from a replacement wireless carrier; loss of the value of his privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation

expenses and time spent on credit monitoring and identity theft insurance; time spent in response to the repeated breaches reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating and responding to fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to his PII permitted by Defendant; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's repeated breaches; lost benefit of his bargains and overcharges for services; nominal and general damages and other economic and non-economic harm.

### COUNT 9

### BREACH OF CONFIDENCE

194.     Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

195.     Plaintiff maintained a confidential relationship with Defendant whereby Defendant undertook a duty not to disclose to unauthorized parties the PII provided by Plaintiff to Defendant to unauthorized third parties. Such PII was confidential and novel, highly personal and sensitive, and not generally known.

196.     Defendant knew Plaintiff's PII was being disclosed in confidence and understood the confidence was to be maintained, including by expressly and implicitly agreeing to protect the confidentiality and security of the PII he collected, stored, and maintained.

197.     As a result of Defendant's repeated breaches, there were unauthorized disclosures of Plaintiff's PII in violation of this understanding. The unauthorized disclosures occurred because Defendant failed to implement and maintain reasonable safeguards to protect the PII in its possession and failed to comply with industry-standard data security practices.

198.     Plaintiff was harmed by way of unconsented disclosures of his confidential information to unauthorized third parties.

199.     But for Defendant's disclosures of Plaintiff's PII in violation of the parties' understanding of confidence, his PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized

third parties. Defendant's repeated breaches were the direct and legal cause of the theft of Plaintiff's PII, as well as the resulting damages.

200.    The injury and harm Plaintiff suffered was the reasonably foreseeable result of Defendant's unauthorized disclosures of Plaintiff's PII. Especially after so many repeated breaches, Defendant  knew its computer systems and technologies for accepting,  securing,  and storing Plaintiff's PII had serious security vulnerabilities because Defendant failed  to observe even basic information security practices or correct known security vulnerabilities.

201.    As a direct and proximate result of Defendant's breach of confidence, Plaintiff has been injured and is entitled to damages in an amount to be proven at trial. Such injuries include the following: ongoing, increased risk of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; new and additional charges from a replacement wireless carrier; loss of the value of his privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring and identity theft insurance; time spent in response to the repeated breaches reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating and responding to fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to his PII permitted by Defendant; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's repeated breaches; lost benefit of his bargains and overcharges for services; nominal and general damages and other economic and non-economic harm.

## **COUNT 10**

## **INVASION OF PRIVACY – INTRUSION UPON SECLUSION**

202.    Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

203.    Plaintiff shared PII with Defendant that Plaintiff wanted to remain private and non-public.

204.    Plaintiff reasonably expected that the PII he shared with Defendant would be protected and secured against access by unauthorized parties and would not be disclosed to or obtained by unauthorized parties, or disclosed or obtained for any improper purpose.

205.    In repeated data breach, Defendant intentionally intruded into Plaintiff's seclusion by disclosing without permission his PII to third parties who then sold his PII to other third- parties on the dark web.

206.    By failing to keep Plaintiff's PII secure, and disclosing PII to unauthorized parties for unauthorized use, Defendant unlawfully invaded Plaintiff's privacy right to seclusion by, inter alia:

   a. intruding into his private affairs in a manner that would be highly offensive to a reasonable person;

   b. invading his privacy by improperly using his PII properly obtained for specific purpose for another purpose, or disclosing it to unauthorized persons;

   c. failing to adequately secure his PII from disclosure to unauthorized persons; and

   d. enabling the disclosure of his PII without consent.

207.    The PII that was publicized during Defendant's eight repeated breaches, including the August 2021 breach, was highly sensitive, private, and confidential, as it included private financial and other PII.

208.    Defendant's intrusions into Plaintiff's seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

209.    As a direct and proximate result of Defendant's invasions of privacy, Plaintiff has been injured and is entitled to damages in an amount to be proven at trial. Such injuries include the following: ongoing, increased risk of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; new and additional charges from a replacement wireless carrier; loss of the value of his privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring and identity theft insurance; time spent in response to the repeated breaches reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating and responding to fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to his PII permitted by Defendant;

the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's repeated breaches; lost benefit of his bargains and overcharges for services; nominal and general damages and other economic and non-economic harm.

## COUNT 11

## BREACH OF EXPRESS CONTRACT (PRIVACY NOTICE)

210.    Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

211.    Plaintiff is a natural person who was a current customer of Defendant as of August 16, 2021.

212.    Defendant's Privacy Notice[93] is an agreement between Defendant and individuals who provided their PII to Defendant, including Plaintiff.

213.    Defendant's Privacy Notice states that it applies "to the personal data we have about you," meaning "data that identifies, relates to, describes, can be associated with, or could reasonably identify you as an individual." It further states that the Notice applies to "all personal data we collect and use when you access or use our cell and data services, websites, apps, and other services (our 'services'), purchase and use our devices and products ('products'), visit our retail stores, or communicate or interact with us in any way."

214.    Defendant's Privacy Notice stated at the time of Defendant's August 2021 breach that Defendant "use[s] administrative, technical, contractual, and physical safeguards designed to protect your data while it is under our control."

215.    Defendant further agreed at the time of the August 2021 breach that it would only share data under certain enumerated circumstances, which include: "with your consent or at your direction," "with the account holder," "between Defendant brands and companies," "to provide benefits," "to our service providers," "to other third parties … for uses described in this notice or for purposes you have requested,"

---

[93] Citations throughout Count 5 are to *Defendant Privacy Policy* (effective May 5, 2021).

"to identity verification and fraud prevention services," "caller ID providers," "in a business transfer or transaction" which is specified as a "corporate business transaction like an acquisition, divestiture, sale of company assets," and "for legal process and protection." None of the enumerated circumstances involve sharing Plaintiff's PII with a criminal hacker.

216.    Defendant emphasized in its Privacy Policy at the time of the August 2021 breach that those who provide their PII to Defendant "trust Defendant to connect you to the world every day, and we're working hard to earn a place in your heart. A big part of that is maintaining your privacy."

217.    Plaintiff on the one side and Defendant on the other formed a contract when Plaintiff obtained services from Defendant, or otherwise provided PII to Defendant subject to its Privacy Policy.

218.    Plaintiff fully performed his obligations under the contract with Defendant.

219.    Defendant breached its agreement with Plaintiff by failing to protect his PII. Specifically, it (1) failed to take reasonable steps to use safe and secure systems to protect that information; and (2) disclosed that information to unauthorized third parties, in violation of the agreement.

220.    As a direct and proximate result of Defendant's breach of contract, Plaintiff has been injured and is entitled to damages in an amount to be proven at trial. Such injuries include the following: ongoing, increased risk of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; new and additional charges from a replacement wireless carrier; loss of the value of his privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring and identity theft insurance; time spent in response to the repeated breaches reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating and responding to fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to his PII permitted by Defendant; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's repeated breaches; lost benefit of his bargains and overcharges for services; nominal and general damages and other economic and non-

economic harm.

## COUNT 12

### BREACH OF IMPLIED CONTRACT

221.     Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

222.     Plaintiff entered into an implied contract with Defendant when he obtained services from Defendant, or otherwise provided PII to Defendant.

223.     As part of these transactions, Defendant agreed to safeguard and protect the PII of Plaintiff and to timely and accurately notify them if his PII was breached or compromised.

224.     Plaintiff entered into the implied contracts with the reasonable expectation that Defendant's data security practices and policies were reasonable and consistent with legal requirements and industry standards. Plaintiff believed that Defendant would use part of the monies paid to Defendant under the implied contracts or the monies obtained from the benefits derived from the PII he provided to fund adequate and reasonable data security practices.

225.     Plaintiff would not have provided and entrusted his PII to Defendant or would have paid less for Defendant's services in the absence of the  implied contract or implied terms between him and Defendant. The safeguarding of Plaintiff's PII was critical to realize the intent of the parties.

226.     Plaintiff fully performed his obligations under the implied contracts with Defendant.

227.     Defendant breached its implied contracts with Plaintiff to protect his PII when over a series of repeated breaches it (1) failed to take reasonable steps to use safe and secure systems to protect that information; and (2) disclosed that information to unauthorized third parties.

228.     As a direct and proximate result of Defendant's breach of implied contract, Plaintiff has been injured and is entitled to damages in an amount to be proven at trial. Such injuries include the following: ongoing, increased risk of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; new and additional charges from a replacement wireless carrier; loss of the value of his

privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring and identity theft insurance; time spent in response to the repeated breaches reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating and responding to fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to his PII permitted by Defendant; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's repeated breaches; lost benefit of his bargains and overcharges for services; nominal and general damages and other economic and non-economic harm.

## COUNT 13

### NEGLIGENT MISREPRESENTATION

229.    Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

230.    Defendant negligently and recklessly misrepresented material facts, pertaining to the sale of wireless and data telephone services, to Plaintiff by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Plaintiff's PII from unauthorized disclosure, release, data breaches, and theft.

231.    Defendant negligently and recklessly misrepresented material facts, pertaining to the sale of wireless and data telephone services, to Plaintiff by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Plaintiff's personal information.

232.    Because of eight repeated data breaches and multiple warnings about the inadequacy of their data privacy and security practices, Defendant either knew or should have known that their representations were not true.

233.    In reliance upon these misrepresentations, Plaintiff purchased wireless and data telephone services from Defendant.

234. Had Plaintiff, as a reasonable person, known of Defendant's inadequate data privacy and security practices, or that Defendant was failing to comply with the requirements of federal and state laws pertaining to the privacy and security of Plaintiff's PII, Plaintiff would not have purchased wireless or data telephone services from Defendant, and would not have entrusted his PII to them.

235. As direct and proximate consequence of Defendant's negligent misrepresentations, Plaintiff has been injured and is entitled to damages in an amount to be proven at trial. Such injuries include the following: ongoing, increased risk of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; new and additional charges from a replacement wireless carrier; loss of the value of his privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring and identity theft insurance; time spent in response to the repeated breaches reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating and responding to fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to his PII permitted by Defendant; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's repeated breaches; lost benefit of his bargains and overcharges for services; nominal and general damages and other economic and non-economic harm.

## COUNT 14

### BREACH OF FIDUCIARY DUTY

236. Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

237. A relationship existed between Defendant and Plaintiff in which Plaintiff put his trust in Defendant to protect Plaintiff's PII and Defendant accepted that trust.

238. Defendant breached the fiduciary duty that they owed to Plaintiff by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect

Plaintiff's PII.

239.    Defendant's breach of fiduciary duty was a legal cause of Plaintiff's damages.

240.    But for Defendant's breach of fiduciary duty, Plaintiff's damages would not have occurred.

241.    Defendant's breach of fiduciary duty contributed substantially to producing Plaintiff's damages.

242.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff has been injured and is entitled to damages in an amount to be proven at trial. Such injuries include the following: ongoing, increased risk of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; new and additional charges from a replacement wireless carrier; loss of the value of his privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring and identity theft insurance; time spent in response to the repeated breaches reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating and responding to fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to his PII permitted by Defendant; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's repeated breaches; lost benefit of his bargains and overcharges for services; nominal and general damages and other economic and non-economic harm.

## COUNT 15

### STORED COMMUNICATIONS ACT (18 U.S.C. § 2702)

243.    Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

244.    The Federal Stored Communications Act ("SCA") contains provisions that provide consumers with redress if a company mishandles their electronically stored information. The SCA was designed, in relevant part, "to protect individuals' privacy interests in personal and proprietary information." S. Rep. No. 99-541, at 3 (1986), reprinted in 1986 U.S.C.C.A.N. 3555 at 3557.

245.   Section 2702(a)(2)(A) of the SCA provides that "a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service." 18 U.S.C. § 2702(a)(2)(A).

246.   The SCA defines "remote computing service" as "the provision to the public of computer storage or processing services by means of an electronic communication system." 18 U.S.C. § 2711(2).

247.   An "electronic communications systems" is defined by the SCA as "any wire, radio, electromagnetic, photo-optical or photo-electronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications." 18 U.S.C. § 2510(4).

248.   Defendant provides remote computing services to the public by virtue of its systems for consumer credit and debit card payments, which are used by autopay customers such as Plaintiff and carried out by means of an electronic communications system, namely the use of wire, electromagnetic, photo-optical or photo-electric facilities for the transmission of wire or electronic communications received from, and on behalf of, the customer concerning customer private financial information.

249.   By failing to take commercially reasonable steps to safeguard sensitive private financial information, Defendant has knowingly divulged Plaintiff's private financial information that was carried and maintained on Defendant's remote computing service solely for Plaintiff's payment verification purposes.

250.   As a result of Defendant's conduct described herein and its violations of Section 2702(a)(2)(A), Plaintiff has been injured and is entitled to damages in an amount to be proven at trial. Such injuries include the following: ongoing, increased risk of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; new and additional charges from a replacement wireless carrier; loss of the value of his privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on

the black market; mitigation expenses and time spent on credit monitoring and identity theft insurance; time spent in response to the repeated breaches reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating and responding to fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to his PII permitted by Defendant; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's repeated breaches; lost benefit of his bargains and overcharges for services; nominal and general damages and other economic and non-economic harm.

## COUNT 16

### UNJUST ENRICHMENT

251.    Plaintiff repeats and realleges the allegations contained in the Statement of Facts as if fully set forth herein.

252.    Plaintiff conferred a monetary benefit on Defendant in the form of monthly payments of approximately $85.00 from October or November 2019 through September 2022 for the purchase of wireless and data telephone services.  These cumulative monthly payments total approximately $3,000.

253.    Plaintiff has an interest, both equitable and legal, in the PII about him that was conferred upon, collected by, and maintained by Defendant and that was ultimately stolen in at least two of Defendant's eight data breaches during Plaintiff's tenure as a customer.

254.    Defendant was benefitted by the conferral upon it of the PII pertaining to Plaintiff and by its ability to retain, use, sell, and profit from that information. Defendant understood that it was in fact so benefitted.

255.    Defendant also understood and appreciated that the PII pertaining to Plaintiff was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

256.    But for Defendant's willingness and commitment to maintain its privacy and confidentiality, that PII would not have been transferred to and entrusted with Defendant.

257.    Defendant admits that it uses the PII it collects for, among other things, advertising and marketing

"products and services from Defendant and other companies to you, including through targeted advertising and communications about promotions and events, contents, and sweepstakes," and conducting research and creating reports "from analysis of things like usage patterns and trends and to deidentify or aggregate personal data to create business and market analysis and reports."[94]

258.    Because of its use of Plaintiff's PII, Defendant sold more services than it otherwise would have. Defendant was unjustly enriched by profiting from the additional services and products it was able to market, sell, and create to the detriment of Plaintiff.

259.    Defendant also benefitted through its unjust conduct by retaining money that it should have used to provide reasonable and adequate data security to protect Plaintiff's PII.

260.    Defendant also benefitted through its unjust conduct in the form of the profits it gained through the use of Plaintiff's PII.

261.    It is inequitable for Defendant to retain the approximately $3,000 it received from Plaintiff and the other benefits it gained through the use of Plaintiff's PII.

262.    As a result of Defendant's wrongful conduct as alleged in this Complaint (including among things its failure to employ adequate data security measures, its continued maintenance and use of the PII belonging to Plaintiff without having adequate data security measures, and its other conduct facilitating the theft of that PII), Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff.

263.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's sensitive PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

264.    It is inequitable, unfair, and unjust for Defendant to retain these wrongfully obtained benefits. Defendant's retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

265.    The benefit conferred upon, received, and enjoyed by Defendant was not conferred officiously or

---

[94] *Defendant Privacy Policy* (effective May 5, 2021).

gratuitously, and it would be inequitable, unfair, and unjust for Defendant to retain the benefit.

266.    Defendant's defective security and its unfair and deceptive conduct have, among other things, caused Plaintiff to unfairly incur substantial time and/or costs to mitigate and monitor the use of his PII and has caused the Plaintiff other damages as described herein.

267.    Plaintiff has no adequate remedy at law.

268.    Defendant is therefore liable to Plaintiff for restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically: the value to Defendant of Plaintiff's PII that was stolen in at least two of Defendant's eight data breaches; the profits Defendant received and is receiving from the use of that information; the amounts that Defendant overcharged Plaintiff for use of Defendant's services; and the amounts that Defendant should have spent to provide reasonable and adequate data security to protect Plaintiff's PII.

## REQUEST FOR RELIEF

Plaintiff respectfully requests a **jury trial or summary jury trial on all potentially applicable issues**. Plaintiff further requests that Court enter judgment in his favor and against Defendant, as follows:

1.    That the Court make a declaratory judgment that a contract was not formed with the Terms and Conditions for lack of mutual assent;

2.    Alternatively, that the Court make a declaratory judgment[95] that Defendant has repudiated the "Class Action Waiver" and arbitration provision in the Terms and Conditions and that Plaintiff has accepted those repudiations, and order a modification of the Terms and Conditions such that the "Class Action Waiver" and arbitration provision are rescinded and no longer in effect;

3.    That the Court grant permanent injunctive relief[96] to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein, including requiring Defendant to delete, destroy and purge Plaintiff's PII;

4.    That the Court award Plaintiff compensatory, consequential, general, and nominal damages in an

---

[95] Declaratory relief is expressly provided for in the Terms and Conditions.

[96] Injunctive relief is expressly provided for in the Terms and Conditions.

amount to be determined at trial;

5.       That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of its unlawful acts, omissions, and practices;

6.       That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

7.       That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorney fees, costs, and expenses;

8.       That the Court award pre- and post-judgment interest at the maximum legal rate; and

9.       That the Court grant all such other relief as it deems just and proper.


Respectfully submitted,


/s/Bradford Clements
By:
Bradford Clements, Esq.
*Pro Se Attorney Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on ⬛⬛⬛ May 22 , 2023, I filed Plaintiff's First Amended Complaint on the Court's NextGen CM/ECF filing system, which caused Defendants' counsel of record to be served by electronic means.

Debbie Jones
ALSTON & BIRD
333 South Hope Street, 16th Floor
Los Angeles, CA 90071-3004
Telephone: (213) 576-1084
Debbie.jones@alston.com
*Attorney for Respondent T-Mobile US, Inc. and T-Mobile USA, Inc.*